UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                 Plaintiff,<br><br>   v.<br><br>EDGAR J. STEELE,<br><br>                Defendant. | Case No. 2:10-cr-000148-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it Defendant Edgar J. Steele's Motion for a New Trial (Dkt. 234) and Supplemental Motion for a New Trial (Dkt. 291). For the reasons sets forth below, the Steele's request for a new trial is denied.

## ANALYSIS

On May 5, 2011, a jury convicted Defendant Edgar J. Steele on four counts: (1) use of interstate commerce facilities in commission of murder for hire, in violation of 18 U.S.C. § 1958; (2) aiding and abetting use of explosive material to commit a federal felony, in violation of 18 U.S.C. § 844(h); (3) aiding and abetting possession of a destructive device in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(B)(ii); and (4) tampering with a victim, in violation of 18 U.S.C. § 1512(b)(3).

Steele now moves for a new trial. He argues that he should be granted a new trial or the case should be dismissed because: (1) the evidence did not establish jurisdiction under 18 U.S.C. § 1958 for Counts I and II of the Indictment; (2) the Court incorrectly charged the jury; (3) the Government engaged in prosecutorial misconduct; (4) the FBI agents engaged in misconduct; (5) his counsel was ineffective; (6) the Court was biased against him and in favor of the Government; and (7) he was denied a public trial.

Federal Rule of Criminal Procedure 33 allows a district court to grant a new trial if the interests of justice so require or based on newly discovered evidence. Fed.R.Crim.P. 33. It must be shown that the newly discovered evidence would probably have resulted in the defendant's acquittal." *Gordon v. Duran,* 895 F.2d 610, 614-15 (9th Cir.1990)

1.  **Lack of Jurisdiction**

Steele first contends that the government failed to prove beyond a reasonable doubt that jurisdiction existed under 18 U.S.C. § 1958 for Counts I and II of the

Indictment. Steele's argument raises an evidentiary question: whether the government presented sufficient evidence at trial to prove that Steele caused Larry Fairfax to travel across state lines in connection with Steele's plot to kill his wife. 18 U.S.C. § 1958. Interstate travel triggers federal jurisdiction for both Counts I and II, since both require the same nexus to interstate commerce. *U.S. v. Driggers*, 559 F.3d 1021, 1024 (9th Cir. 2009).

Steele argues that the required nexus to interstate commerce did not exist because Fairfax and James Maher travel to Oregon on June 11, 2010 at the behest of the government – not Steele. Therefore, argues Steele, he "has standing to raise intrusion upon the sovereignty of the State of Idaho under the Tenth Amendment as expressed in *Bond*,[1] such that Defendant's intra-state Idaho crimes, if any, must be prosecuted locally." *Def.'s Reply* at 2, Dkt. 308. Steele cites *U.S. v. Coates,* 949 F.2d 104, 106 (4th Cir. 1991) to support his argument. While *Coates* did involve a similar claim that the government manufactured jurisdiction, it is clearly distinguishable from the facts of this case.

In *Coates*, the defendant unwittingly contacted a government informer to carry out the murder of his step-brother. 949 F.2d at 106. The informer worked with the government to collect evidence of a federal crime, but after a month of surveillance the

---

[1] Steele cites *Bond* as *Bond v. U.S.*, 09-1227 (U.S. June 16, 2011).

government still lacked any evidence of the defendant's use of interstate mail or wire facilities in connection with the murder-for-hire plot. *Id.* To create the needed jurisdictional hook, a government agent involved in the case drove from Maryland to Virginia for the sole purpose of making a telephone call to the defendant across state lines. *Id.* The defendant never traveled across state lines, and he never directed the government agent to travel across state lines. *Id.* The Fourth Circuit therefore concluded that the government could not prosecute the defendant for arranging a murder-for-hire through the use of interstate commerce facilities because the government had contrived jurisdiction based solely on the actions of its own agents. *Id.*

This case, however, is distinguishable from *Coates*. In this case, the jury was entitled to infer from the evidence the following facts: Steele commissioned Larry Fairfax to murder his wife, Cyndi Steele, by placing a pipe bomb under her car; Steele knew his wife would be travelling to see her mother in Oregon, and Steele intended that the pipe bomb would detonate during the course of Mrs. Steele's trip between Idaho and Oregon; when it did not, Steele insisted that Fairfax drive to Oregon to remove the bomb placed under the car because Steele feared it would be discovered during a planned mechanical service on the car; on May 28, 2010, Fairfax drove to Oregon at Steele's behest to facilitate Steele's scheme to kill Mrs. Steele. Jim Maher, Fairfax's cousin, corroborated the date and purpose of Fairfax's trip from Idaho to Oregon.

The pipe-bomb plan failing, Steele devised a new plan. Steele insisted that Fairfax make another trip to Oregon while Steele's wife was visiting her mother and kill Mrs.

Steele in an apparent car accident or, if necessary, with a gun. Steele gave Fairfax $400 to defray the cost of the travel on June 11, 2010. By this time, Fairfax was working with the government, and this conversation between Fairfax and Steele was recorded. The government took the $400 Steele gave to Fairfax as evidence but allowed Fairfax to travel to Oregon to make it appear that Fairfax intended to carry out Steele's plot.

Based on each of these trips, a jury could have found beyond a reasonable doubt that Steele, with a murderous intent, caused Fairfax to travel across state lines. There is no evidence that the government "manufactured" jurisdiction as it did in *Coates*. To the contrary, the evidence showed that on more than one occasion, Steele directed Fairfax to cross state lines to facilitate Steele's plot to murder his wife, and Fairfax did travel across state lines.

Simply because Fairfax was working as a government agent when he travel to Oregon the second time does not bar Steele's conviction. *See, e.g., U.S. v. Smith*, 749 F.2d 1568, 1569 (11th Cir. 1985). Rather, analogous cases suggest that "a government agent or informer must unilaterally supply the interstate element of the offense at the government's behest – e.g., when the agent goes out of state merely for the purpose of making the interstate call and creating the federal jurisdiction – before federal jurisdiction will be deemed to have been improperly manufactured." *Id. See also United States v. Bagnariol,* 665 F.2d 877, 899 (9th Cir. 1981)(sustaining defendant's conviction by causing the use of an interstate facility based on a call from an FBI agent in Oregon to the defendant in Washington).

Steele also argues that the jurisdictional element did not exist because "the evidence was crystal clear that Mr. Fairfax did not have the intent that a 'murder be committed'" when he travel across state lines. *Def's Reply* at 2, Dkt. 308. But Fairfax's intent makes no difference because he was not charged under § 1958. It only matters that Steele – not Fairfax – had a murderous intent when he caused Fairfax to travel across state lines. *U.S. v. Driggers*, 559 F.3d at 1024 ("But the defendant must have intended that a murder be committed, and have caused the travel with this murderous intent.") . The jury found beyond a reasonable doubt that Steele had a murderous intent, and he caused Fairfax to travel across state lines to facilitate his scheme to kill his wife. Therefore, the jurisdictional elements for Counts I and II are satisfied, and Steele has no argument that Section 1958 as applied to him violates state sovereignty.

2. **Erroneous Instruction**

Steele next argues that the Court had no discretion to issue a supplemental instruction to the jury defining the term "cause" as used in 18 U.S.C. § 1958. By issuing the instruction, according to Steele, the Court watered down the standard of proof from "beyond a reasonable doubt" to proof by a preponderance of the evidence.

Steele's first argument that the Court had no discretion to issue a supplemental instruction in response to a jury question does not accurately represent the law. "[A] trial judge, as "governor of the trial,"… enjoys "wide discretion in the matter of charging the jury." *Arizona v. Johnson*, 351 F.3d 988, 994 (9th Cir. 2003)(quoting *Quercia v. United States,* 289 U.S. 466, 469 (1933) and *Charlton v. Kelly,* 156 F. 433, 438 (9th Cir. 1907)).

"This 'wide discretion' carries over to a trial judge's response to a question from the jury." *Id.* Indeed, "[w]hen a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy." *Bollenbach v. U.S*, 326 U.S. 607, 612-613 (1946). Here, the Court found that issuing a supplemental instruction, rather than simply referring the jury back to the original instructions, would better clear away the jury's confusion. Based on this conclusion, this Court acted within its "wide discretion" in issuing the supplemental instruction.

Steele also fails to convince the Court that the supplemental instruction "watered down" the standard of proof from "beyond a reasonable doubt" because it created "a virtual presumption of interstate commerce that [could not] be overcome (almost a strict liability standard)." *Def.'s Supp.Mot.* at 4, Dkt. 291. The Court's supplemental instruction clarified the definition of cause as used in Section 1958: "As to Count 1, the defendant "caused another to travel in interstate commerce" if the other individual traveled in interstate commerce and would not have done so but for the defendant's conduct." *Answer to Jury Question No. 2*, Dkt. 231. The Court's answer correctly defined cause and in no way lowered the government's burden of proof.

The conduct made criminal by Section 1958, is "caus[ing] another…to travel in interstate or foreign commerce…with intent that a murder be committed…." 18 U.S.C. § 1958. "[A] defendant can violate section 1958 without intending to cause anyone to travel across state lines." *Driggers*, 559 F.3d at 1024. In other words, there is no intent requirement with respect to use of interstate commerce and this element of the crime is

purely jurisdictional. *Id.* In fact, the government need not even establish that the defendant knew interstate commerce was used. *United States v. Edelman,* 873 F.2d 791, 794-95 (5th Cir. 1989). Instead, it is enough that the proof showed Fairfax would not have traveled across state lines either the first or second time 'but for' Steele's request that Fairfax kill Mrs. Steele. *Id.* The Court therefore correctly defined "cause" in this context when it instructed the jury to apply a 'but for' standard.

Steele, however, suggests that the Court's definition of "cause" distracted from the real issues in this case: (1) whether the specific purpose of Fairfax's trip on May 31, 2010 was to kill Mrs. Steele; and (2) whether Fairfax traveled to Oregon on June 11, 2010 at Steele's direction because Fairfax was acting as a government decoy at that time. Steele's argument is flawed.

First, for Steele to be found guilty under Section 1958, Fairfax did not have to travel to Oregon on May 31, 2010 for the specific purpose of killing Steele's wife as long as Steele had already formed a murderous intent when he directed Fairfax to make the trip. *Driggers*, 559 F.3d at 1024. It only matters that Fairfax traveled to Oregon to facilitate the murder-for-hire plot. *U.S. v. Perrin*, 580 F.2d 730, 736 (5th Cir. 1978) ("There is no requirement that the use of interstate facilities be essential to the scheme: it is enough that the interstate travel or the use of interstate facilities makes easier or facilitates the unlawful activity.") And the evidence showed that Steele asked Fairfax to travel to Oregon on May 31, 2011 to keep the plan alive.

Second, as already discussed above, it also makes no difference that Fairfax was acting as a government agent when he traveled on June 11, 2010. The evidence showed that Steele asked Fairfax to travel to Oregon on June 11, 2010 to kill Mrs. Steele – either by an apparent car accident or with a gun. This evidence establishes that Steele caused Fairfax to travel to June 11, 2010. *See, e.g., Bagnariol,* 665 F.2d at 899.

Because the Court accurately defined "cause" as used in Section 1958, the Court's supplemental instruction did not degrade the standard of proof from "beyond a reasonable doubt" to "proof by a preponderance of the evidence." This conclusion is further bolstered by the fact that the original instructions stated nine separate times that the government must prove each crime charged beyond a reasonable doubt and five separate times that the government had the burden of proving each element of the crime charged. Therefore, any potential vagueness was mitigated by the final instructions read as a whole, which reiterated multiple times that the government had to prove each element beyond a reasonable doubt. *United States v. Harrison,* 34 F.3d 886, 889 (9th Cir. 1994).

### 3. Prosecutorial Misconduct

Steele argues that the government engaged in prosecutorial misconduct by (1) monitoring Steele's phone calls with a non-retained attorney; (2) monitoring Steele's outgoing "legal mail" sent to non-retained attorneys; (3) monitoring Steele's in-jail attorney booth conferences; (4) failing to disclose a report from co-defendant Fairfax's expert, Jeff Buck; and (5) failing to disclose a draft of a fictional book written by Fairfax.

When prosecutorial misconduct deprives a criminal defendant of a fair trial, the defendant's due process rights are violated, and a new trial may be warranted.

### A. *Phone Calls*

This Court already considered the issue of whether the government improperly invaded Steele's attorney-client privilege by listening to Steele's telephone calls with non-retained counsel and found that Steele waived any privilege that may have existed. *Memorandum Decision and Order Dated February 2, 2011*, Dkt. 90. An inmate's telephone conversation with counsel is not protected by the attorney-client privilege where the inmate is notified at the outset that the calls are recorded and subject to monitoring. *See, e.g., United States v. Lentz,* 419 F.Supp.2d 820, 828-29 (E.D.Va. 2005); *c.f.*, *United States v. Van Poyck*, 77 F.3d 285, 291 (9th Cir. 1996) (finding prisoner had no reasonable expectation of privacy in outbound phone calls made from a jail). Therefore, the prosecutor did not engage in prosecutorial misconduct by listening to non-privileged calls with non-retained counsel.

### B. *Legal Mail*

The prosecutor did not violate Steele's due process rights by reading letters that Steele labeled "Legal Mail" and sent to a Mr. David Basker. These letters were opened by the jail and provided to the government. The government, in turn, provided those letters to Steele in discovery. The Court understands that the jail's internal procedures call for them to review all outgoing mail unless it is sent to "an attorney of record," and it is undisputed that Mr. Basker never acted as Steele's attorney of record. Indeed, it does

not appear that Steele ever retained Mr. Basker in any capacity. Critical to any assertion of the privilege is, of course, the existence of an attorney-client relationship. *C.f., United States v. Bauer*, 132 F.3d 504, 507 (9th Cir. 1997). Here, however, Steele failed to show, or even allege, that such a relationship existed and therefore it does not appear that the letters were privileged.

Moreover, there is no evidence that the prosecutors used any information contained in the letter at trial. In his correspondence, Steele just thanked Mr. Basker for his previous letter, and asked Mr. Basker if he wanted to help him in any way by "checking out" Roger Peven or finding qualified experts to testify at trial. Therefore, Steele cannot show that he was prejudiced by the Government's reviewing the letter to Mr. Basker.

### C. *In-Jail Attorney Booth Conferences*

Steele claims that the Government listened to his attorney-client meeting that occurred between Steele and his attorney in the attorney-client booth. As an example of this, Steele refers to a special hearing that occurred on May 3, 2011. In this hearing, the Court reported that it had received information from the US Marshall that Steele had told his attorney, "he may develop a health problem that would cause a continuance of the trial, so that Dr. Papcun would be able to return to America and testify." *Def's Reply* at 10, Dkt. 308. The prosecutor was not present at this hearing and had no involvement in reporting the statement Steele made to his attorney. Steele cites no other examples of the prosecutor listening to attorney-booth conversations. Therefore, there is no evidence that

the prosecutor ever listened to Steele's conversations with his attorney while in the attorney-client booth.

D. *Fairfax Book*

The prosecutor did not violate *Brady v. Maryland,* 373 U.S. 83 (1963) by failing to disclose the fictional book written by Fairfax while he was imprisoned because the prosecutor never had possession of the book until ordered to obtain it by the Court. *Brady* requires prosecutors to disclose to the defense any evidence favorable to the accused and material to guilt or punishment. This included any information contained within the files or in the possession of these law enforcement officers because knowledge of such evidence is imputed to the prosecutor. *United States v. Sanchez*, 50 F.3d 1448, 1453 (9th Cir. 1995). But information in the possession of third parties is not imputed to the prosecutor. *See United States v. Josleyn*, 206 F.3d 144, 153-54 (1st Cir. 2000).

The prosecutor only learned about the "book" Fairfax was writing during trial when the defense counsel cross-examined Fairfax. Fairfax testified that the book was at his home in north Idaho, and he had never told the prosecution about the book. At the request of the defense, the Court ordered Fairfax's attorney to retrieve the book; Fairfax's attorney turned the book over to the prosecution. The Court later acknowledged that it made a mistake in ordering the prosecution to obtain the book and determined that it was not *Brady* material. The prosecution provided the book to the Court because it believed it could qualify as Jencks Act Material pursuant to 18 U.S.C. 3500. The Court reviewed the book, made redactions, and provided it to the defense after issuing a protective order.

Under these facts, there was no *Brady* violation. The prosecutor never "possessed" the book. Moreover, the Court provided the defense counsel a copy of the book, and defense counsel used it to further cross-examine Fairfax. Therefore, this alleged withholding of the Fairfax book cannot be a basis to order a new trial.

E.   *Jeff Buck Report*

The *Brady* analysis above applies equally to the Jeff Buck report. Steele alleges that the government failed to disclose a report from co-defendant Fairfax's expert, Jeff Buck. But the government never possessed this report. Therefore, there was no *Brady* violation.

Steele also fails to establish that the Jeff Buck report constitutes "newly discovered evidence" warranting a new trial. Steele maintains that the report showed that the pipe-bomb Fairfax constructed would not explode. But this allegation is not new evidence. Fairfax testified on direct that he designed the pipe-bomb so it would not explode from the heat generated from the exhaust pipe of Mrs. Steele's car. And Steele's counsel then questioned Fairfax about the ignition source and the amount of powder in the pipe. Steele then argued during closing that there was no evidence to contradict Fairfax's testimony that the pipe bomb would not have exploded. The questions by Steele's attorneys demonstrate that Steele was aware of potential evidence that the bomb would not explode; thus, Buck's report is not new evidence warranting a new trial. *United States v. Hinkson*, 585 F.3d 1247 (9th Cir. 2009), *cert. denied*, 131 S. Ct. 2096 (2011).

4. **Governmental Misconduct**

   A. *Recordings*

Steele contends that he is entitled to a new trial because FBI Special Agent Sotka failed to listen to recordings made on June 9, 10, 11, 2010 on the initial device and therefore could not attest to its authenticity. Steele maintains that the "evidence that the tic tac sound which the Government explained at trial, which was not on any of the copies of the recordings of June 9th and 10th, 2010 shows that there is a very serious question whether the government fabricated these recordings." *Def's Reply* at 12, Dkt. 308. Steele further argues that Special Agent Sotka destroyed the "original" recordings in bad faith. These arguments are flawed for several reasons.

First, the recording device has no speaker. Thus, Special Agent Sotka had no means to listen to the recording on the original device. David Snyder, a Forensic Audio Examiner with the FBI, testified during a Daubert hearing on April 21, 2011 that audio recorded on the recorder cannot be monitored or reviewed until it is downloaded from the recorder to a computer. The audio on the recording device is then erased. This is to prevent tampering. *Daubert Hearing Tr.* at 249-300, April 21, 2011. Because Special Agent Sotka could not listen to the recording on the original device, he downloaded the recording on to a disc, which he duplicated and put into a WAV file. *Id.* at 354. He listened to the recording as it was copying to a WAV file. *Id.* at 354. Special Agent Sotka followed procedure by downloading the recordings to discs in a proprietary format.

These recordings were provided to the defense in the proprietary format with a version of the proprietary player. *Snyder Aff.* ¶ 1, Dkt. 305-3.

In addition, Fairfax testified to the authenticity of the recording. Steele may call him a liar, but it was the jury's job to decide whether Fairfax lied about his recorded conversations with Steele. The jury had the opportunity to weigh Fairfax's testimony against the testimony of Mrs. Steele and her daughter, who both stated that they noticed anomalies with the recordings.

Finally, even if it could be said that Special Agent Sotka "destroyed" evidence by erasing the audio from the recording device after he downloaded it to a proprietary disc, Steele cannot show bad faith. Under *Arizona v. Youngblood,* 488 U.S. 51 (1988), the government's failure to preserve evidence "of which no more can be said than it could have been subjected to tests, the results of which might have exonerated the defendant" does not deny a criminal defendant due process unless the defendant can show law enforcement acted in bad faith. *U.S. v. Heffington*, 952 F.2d 275, 280 (9th Cir. 1991). Here, Steele presents no evidence demonstrating Special Agent Sotka acted in bad faith by erasing the audio from the recording device. To the contrary, the evidence showed that Special Agent Sotka acted in accordance with standard procedures and, in fact, erasing the audio from the recording device actually prevents tampering. *Snyder Aff.* ¶ 5, Dkt. 305-3.

For these reasons, the Court declines to hold an evidentiary hearing on the authenticity of the recording. Steele was given ample opportunity during the Daubert

hearing and trial to test the authenticity of the recordings. And Steele does not prevent any additional evidence to persuade the Court that another hearing on this issue is warranted.

### B. *Witness Tampering*

Steele accuses the government of witness tampering. He says that the FBI tried to persuade Mr. Daryl Hollingsworth not to testify. In *U.S. v. Vavages,* the Ninth Circuit noted: "[i]t is well established that 'substantial government interference with a defense witness's free and unhampered choice to testify amounts to a violation of due process." 151 F.3d 1185, 1188 (9th Cir. 1998)(internal citations omitted). However, "a defendant alleging such interference is required to demonstrate misconduct by a preponderance of the evidence." *Id.* Yet, Steele cites no evidence even suggesting that the prosecutor interfered with Hollingsworth's decision to testify. Moreover, he did testify, which completely undermines Steele's argument.

### C. *Failure to Report Car Bomb*

Steele also argues that Special Agent Sotka engaged in misconduct by failing to report the car bomb that was attached to Mrs. Steele's car. Special Agent Sotka, however, testified that Fairfax did not tell him that Fairfax had placed a bomb underneath Mrs. Steele's car. Also, Fairfax testified that he did not tell Special Agent Sotka that he had placed a bomb under Mrs. Steele's car. With no evidence that Special Agent Sotka knew that the pipe bomb remained under Mrs. Steele's car, there is no evidence of government misconduct in this respect.

### 5. Judicial Bias

Steele argues that a "new trial is required because of arbitrary judicial action favoring the Government." *Def's Supp. Motion* at 18, Dkt. 291. He maintains that the "record is replete with examples of the trial court's favoritism toward the Government (e.g. arbitrary exclusion of Defendant's expert over a timing problem create by the Court, exclusion of the Government's admissions against interest statements offered by Mrs. Steele, erroneous restrictions on witness examination, and rushing the defendant through trial, to name a few.)." *Id.* Due process requires that trials be conducted free of actual bias as well as the appearance of bias. *Bracy v. Gramley,* 520 U.S. 899, 904–05 (1997)). There is a strong presumption that a judge is not biased or prejudiced. *Id.*

The judicial bias about which Steele complains relates to adverse evidentiary rulings. Judicial rulings alone almost never constitute valid evidence of bias. *Liteky v. U.S.*, 510 U.S. 540, 544 (1994). Almost invariably, they are proper grounds for appeal, not for showing bias. *Id.* In this case, nothing about the Court's rulings displayed such a degree of favoritism or antagonism to show actual bias. And Steele will have an opportunity to challenge any adverse rulings on appeal. Thus, the Court finds that a new trial is not warranted based on an allegation of judicial bias.

### 6. Ineffective Assistance of Counsel

Finally, Steele argues that his counsel was ineffective. The proper procedure for challenging the effectiveness of counsel is by a collateral attack on the conviction under 28 U.S.C. § 2255, after a full record can be developed. *See U.S. v. Ross*, 2011 WL

2678832 (9th Cir. 2011)(unpublished)(affirming denial of motion for new trial based on ineffective assistance). Therefore, the Court will not consider this argument.

## ORDER

**IT IS ORDERED** that Defendant Edgar J. Steele's Motion for a New Trial (Dkt. 234) and Supplemental Motion for a New Trial (Dkt. 291) are **DENIED**.

DATED: November 8, 2011

B. Lynn Winmill
Chief Judge
United States District Court